AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Western District of New York

*FILED JUL 02 2010 — UNITED STATES DISTRICT COURT — MICHAEL J. ROEMER, CLERK — WESTERN DISTRICT OF NY*

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No.  10-MJ - 605 |
| | ) |
| | ) |
| KARL KLEBER | ) |
| Defendant(s) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   March to September 2008 inclusive   in the county of   Monroe   in the
  Western   District of   New York   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C., Section 545 | Smuggling goods into the United States |
| Title 18, U.S.C., Section 2 | Aiding and Abetting |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
Complainant's signature

M. DIXON ROBIN, Special Agent, ATF
Printed name and title

Sworn to before me and signed in my presence.

Date:   7/2/10

_____
Judge's signature

City and state:       Rochester, New York       Hon. JONATHAN W. FELDMAN, U.S. Mag. Judge
Printed name and title

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

10-mj-605

     -v-

AFFIDAVIT

KARL KLEBER,

        Defendant.

---

STATE OF NEW YORK  )
COUNTY OF MONROE   ) SS:
CITY OF ROCHESTER  )

**I, M. Dixon Robin, being duly sworn, state the following:**

1.    Your affiant, Special Agent M. Dixon Robin, is a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and has been so employed for the past 11 years.  Your affiant also has prior experience as a Criminal Investigator with both the National Aeronautics and Space Administration Office of Inspector General and the National Science Foundation Office of Inspector General. Additionally, your affiant holds a Bachelor of Arts degree in History and a Masters of Arts degree in Forensics (with an emphasis in Crime in Commerce).  Your affiant has received over 1,000 hours of law enforcement training from the Federal Law Enforcement Training Center, the ATF National Academy, and various other law

enforcement sources. That training included basic instruction in the laws of firearms, firearms accessories, and ammunition importation. Your affiant has been involved in over three hundred firearms investigations and has participated in numerous federal and state search warrants involving firearms and ammunition.

2. This affidavit is submitted in support of a Criminal Complaint charging Karl KLEBER with violations of Title 18, United States Code, Sections 545 (Smuggling Goods Into the United States) and 2 (Aiding and Abetting), by aiding and abetting and willfully causing the fraudulent and knowing importation of Chinese-manufactured AK-47 rifle drum magazines contrary to law. I have not included herein each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to support a criminal complaint and cause the issuance of a warrant for arrest charging Karl KLEBER with the aforementioned violations.

## *Applicable Criminal Statute and Regulations*

3. Title 18, United States Code, Section 545 makes it an offense for any person to fraudulently or knowingly import or bring into the United States any merchandise contrary to law.

2

4.   Title 27, Code of Federal Regulations, Section 447.42(a)(1)(iv)(A) provides that the ATF Form 6--Part 1 permit application to import into the United States an article on the U.S. Munitions Import List must contain the name and address of the manufacturer of the defense article to be imported.

5.   Title 27, Code of Federal Regulations, Section 447.61(c) makes it an offense to willfully violate any provision of Part 447 of Title 27 of the Code of Federal Regulations, which Part relates to the importation of arms, ammunition and implements of war.

6.   Title 27, Code of Federal Regulations, Section 447.62 makes it an offense, in a permit application, to willfully make any untrue statement of a material fact or to fail to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

7.   Title 27, Code of Federal Regulations, Section 447.63 makes it an offense to knowingly import into the United States contrary to law any article on the U.S. Munitions Import List.

*Case Background*

8.    Section 38 of the Arms Export Control Act of 1976 ("AECA") authorizes the President of the United States, in furtherance of world peace and the security and foreign policy of the United States, to control the importation of items which have been designated as defense articles and to promulgate regulations for the import of such articles.   22 U.S.C. § 2778(a)(1).   The statute also provides that no designated defense articles may be imported without a license issued in accordance with the AECA and regulations issued thereunder.   22 U.S.C. § 2778(b)(2).   Authority under Section 38 has, in turn, been delegated to the Secretaries of State and Defense and the Attorney General.   The delegation grants the Attorney General  primary  responsibility  for  issuing  and administering permanent import controls of defense articles and the Attorney General has delegated implementation authority to ATF.[1] See Exec. Order No. 11,958, 1977 WL 23589 (Pres.Exec.Order), 42 FR 4311, as amended by Exec. Order No. 13,284, 2003 WL 24226260 (D.O.J.), 68 FR 4075; Appleton v. United States, 180 F.Supp.2d 177, 179 (D.D.C. 2002); B-West Imports, Inc. v. United States, 75 F.3d 633, 636 (Fed.Cir. 1996).   The ATF regulations issued under the

---

[1]    Effective January 24, 2003, ATF was moved from the Department of the Treasury to the Department of Justice by the Homeland Security Act of 2002.

4

authority of Section 38 of the AECA that are concerned with the importation of arms, ammunition and implements of war are found at Part 447 of Title 27 of the Code of Federal Regulations.

9.   Under those ATF regulations, the U.S. Munitions Import List ("List") enumerates articles subject to import controls.   27 C.F.R. § 447.21.   Among the articles on the List are "Category I-Firearms" items, which include "Automatic firearms and all components and parts for such firearms to caliber .50 inclusive." According to ATF's Firearms Technology Branch Firearms Enforcement Officer Richard Vasquez, this category includes AK-47 rifle drum magazines.

10.   The ATF regulations also provide that persons seeking to import into the United States defense articles on the List must obtain a permit from the agency through ATF's Firearms and Explosives Imports Branch prior to the actual importation of the item.   *See* 27 C.F.R. § 447.41(a).   ATF requires prospective importers of such defense articles, including AK-47 rifle drum magazines, to apply for a permit by completing and filing an ATF Form 6-Part I ("Form 6"), entitled "Application and Permit for Importation of Firearms Ammunition and Implements of War," which includes a certification by the applicant that states: "Under the

5

penalties provided by law, I declare that I have examined this application, including the documents submitted in support of it, and, to the best of my knowledge and belief, it is true, correct, and complete." 27 C.F.R. § 447.42(a). Form 6 requires an applicant, among other things, to provide the name and address of the manufacturer of the article to be imported. The items listed on the Form 6 are scrutinized by ATF to determine if they originate from a country whose defense articles are banned from importation. When a permit is granted by ATF, the importer must present an ATF Form 6A, "Release and Receipt of Imported Firearms, Ammunition and Implements of War," to U.S. Department of Homeland Security, U.S. Customs and Border Protection ("CBP") officials to secure release of the imported product from CBP custody. *See* 27 C.F.R. § 447.45(a). Form 6A also requires the importer, among other things, to provide the name and country of the manufacturer of the defense article being imported.

11. Your affiant knows that China is one of the countries on the State Department's "proscribed list," a list of countries as to which it is "the policy of the United States to deny licenses and other approvals" for the importation of defense articles originating there. 27 C.F.R. § 447.52; 22 C.F.R. § 126.1(a). Accordingly, it is illegal to fraudulently or knowingly import, or

6

cause to be so imported, the Chinese-manufactured AK-47 rifle drum magazines central to this case.

12.   In approximately December 2008, your affiant received information from ATF Industry Operations Inspector (IOI) Wilkins concerning the alleged importation of approximately 5,760 Chinese-manufactured AK-47 rifle drum magazines into Rochester, New York, by ATI, a Federal Firearms Licensee.  This importation occurred in August 2008, and the drum magazines were sold by Transarms Handelsgesellschaft, MBH and Co. KG ("Transarms"), an international arms broker company based in Germany.   The drum magazines were claimed by Transarms and ATI to be manufactured by NITI (Bulgarian acronym for Science, Research and Technology Engineering) in Bulgaria.   IOI Wilkins reported that ATF's Firearms Technology Branch ("FTB") had contacted him in regards to this issue after receiving information concerning the drum magazines.

13.   Subsequently, your affiant received information from ATF FTB Firearms Enforcement Officer ("FEO") Richard Vasquez concerning the drum magazines in question.   FEO Vasquez stated that he had received information from another licensed importer, Stacy Prineas, that ATI had imported drum magazines that were falsely reported as being manufactured in Bulgaria.   FEO Vasquez stated that he spoke

with an official at Arsenal Inc., a Bulgarian firearms company with operations in both Bulgaria and the United States. FEO Vasquez stated that he received information that no 75-round AK-47 rifle drum magazines, such as those imported by ATI, were ever manufactured in Bulgaria.

14. Your affiant has reviewed public records and ATF licensing information that show that AmChar Wholesale, Inc. ("AmChar"), located at 100 Airpark Drive, Rochester, New York, 14624, is a current Federal Firearms Licensee ("FFL"). The company holds two licenses, one for the dealing of firearms and the other for the manufacture of firearms. The company is owned and operated by Anthony DiChario. Based on public records and research within ATF licensing records, your affiant has determined that American Tactical Imports, Inc. ("ATI"), is co-located with AmChar and also owned and operated by Anthony DiChario. ATI holds a license for the importation of firearms.

15. Your affiant has received information from Bundeskriminalamt ("BKA"), or Federal Criminal Police Office of Germany, investigators that Transarms is an international arms, ammunition, and accessories dealer located in Worms, Germany, and is headed by Karl KLEBER.

8

16.   Your affiant, along with U.S. Department of Homeland Security, Immigration and Customs Enforcement ("ICE") Special Agent Mark Reimann, has engaged in a joint ICE/ATF investigation of AmChar/ATI, Transarms, and Karl KLEBER.  Based on the evidence and information obtained during the investigation, more fully described below, your affiant believes that Karl KLEBER, through his business Transarms, purchased approximately 5,760 75-round AK-47 rifle drum magazines from China in March 2008.   The drum magazines were originally shipped from China to Manchester, England, for Transarms.   Karl KLEBER then attempted to provide the drum magazines to Paul Restorick of Mil-Tec Marketing UK ("Mil-Tec"), Kent, United Kingdom.   Paul Restorick sought to use the drum magazines to satisfy a contract he and his company had previously entered into in 2007 with General Defense Corporation, a company based in the United States.   When the drum magazines could not be utilized to satisfy the contract (due to their country of origin), Karl KLEBER subsequently shipped the drum magazines to Transarms, his company in Germany.   Transarms thereafter sold these drum magazines to ATI in Rochester, New York, and knowingly concealed information from ATI concerning the drum magazines' true country of origin.   Karl KLEBER knowingly provided false information to officials at ATI which caused them to claim to the U.S. government that the country of origin for the drum magazines was Bulgaria.

Additional evidence described below establishes Karl KLEBER's ties with China and additional purchases of Chinese-made drum magazines subsequent to the one in March 2008. Your affiant submits that, through this investigation, evidence has been developed that Karl KLEBER knowingly violated Title 18, United States Code, Sections 545 and 2 by knowingly aiding and abetting and willfully causing the importation into the United States of Chinese-manufactured AK-47 rifle drum magazines contrary to law, that is, in violation of Title 27, Code of Federal Regulations, Sections 447.42(a)(1)(iv)(A), 447.61(c), 447.62 and 447.63.

17. On or about January 22, 2009, your affiant interviewed AmChar and ATI owner Anthony DiChario and accounts manager Susan Hurley regarding the drum magazine importation. DiChario and Hurley explained that ATI had purchased approximately 5,760 AK-47 rifle drum magazines from Transarms in August 2008. DiChario stated that he arranged the deal with Transarms while at a trade show in Germany. DiChario stated that he believed he was purchasing Bulgarian-made AK-47 drum magazines. DiChario stated that he questioned the Transarms representative concerning the origin of the magazines and was assured that they were not manufactured in China. DiChario stated that he was aware of the ban on importation of Chinese AK-47 drum magazines and that he

10

never knowingly violated this ban.  DiChario stated that he was assured that the magazines ATI/AmChar was purchasing were manufactured in Bulgaria, and was given documentation containing the factory name and address where they were made.  He pointed out on paperwork later provided to your affiant that the name of the company that supposedly manufactured the magazines in question was NITI and that it was located in Kasnalak, Bulgaria.

18.  DiChario further stated that the "Bulgarian-manufactured" magazines had a special stamp on them, a circle enclosing the numeral "10".  During the interview, DiChario allowed your affiant to examine one of the "Bulgarian" magazines.  DiChario stated that he only had 49 left in stock, and that these were set aside for customers who had ordered them.  During the interview, DiChario and Hurley provided copies of documents related to ATI's purchase of the magazines, which included copies of:

a.   A Transarms Bill of Lading dated August 20, 2008, listing "NITI AK47 DRUM MAGAZINES" and showing the importation of 45 cases of drum magazines into the United States from Hamburg, Germany;

b.   ATF Form 6, Application and Permit for Importation of Firearms Ammunition and Implements of War, completed by ATI on March 18, 2008 (and approved by ATF on April 10, 2008), requesting permission to import 10,000 drum magazines;

c.   ATF Form 6A, Release and Receipt of Imported Firearms, Ammunition and Implements of War, undated, listing 5,760

drum magazines under "NITI, 762x39 75rd Drum Magazines Pre-Ban unmarked 1992-1993, Category I(b)"; and

d.    Transarms invoice, confirmation letter, and packing list regarding the magazines, dated August 12, 2008, detailing the sale of 5,760 AK-47 rifle drum magazines to ATI at $60 each for a total of $345,600.  The confirmation letter states that ATI representative Guy Tinsley is witnessing the loading of the drum magazines into a container.

19.   During the investigation, your affiant reviewed the above-described ATF Form 6, granting Permit No. 08-02298, which was completed and submitted by ATI regarding the importation of the drum magazines from Transarms in Germany.  It shows "NITI, Kasnalak/Bulgaria" as the name and address of the manufacturer of the drum magazines.  Records of U.S. Customs and Border Protection show that the drum magazines in question arrived into the Port of New York on September 1, 2008.

### The General Defense Corporation Lawsuit

20.   Your affiant has learned from Special Agent Reimann that, in December 2009, he interviewed Carlos Davidov, President of General Defense Corporation ("GDC"), Westin, Florida.  The purpose of the interview was to discuss the relationship between GDC and Paul Restorick and his company Mil-Tec in Kent, United Kingdom, and a contract that both entities entered into for military accessories and supplies, including 75-round drum magazines obtained by Karl

KLEBER.   Your affiant additionally reviewed legal filings made by GDC in furtherance of a lawsuit against Paul Restorick and Mil-Tec.

21.   In July 2006, GDC was awarded a contract by Taos Industries, Madison, Alabama, to supply certain military weapons, parts, products and equipment to Taos Industries.   The list of goods to be provided included 5,052 AK-47 rifle drum magazines.   In order to fulfill its contractual obligations with Taos Industries, on or about April 3, 2007, GDC subcontracted with Paul Restorick and Mil-Tec to obtain certain supplies related to the contract, including, but not limited to, 5,752 75-round drum magazines.   In June 2007, GDC sent an $800,000 down payment to Paul Restorick and Mil-Tec in order to purchase the supplies for the subcontract. Paul Restorick and Mil-Tec were able to fulfill certain aspects of the contract with GDC.   However, Paul Restorick and Mil-Tec were unable to fulfill the drug magazine portion of their contract, and only provided tripods as called for in the contract.

22.   According to the Davidov interview, Paul Restorick continuously claimed that he could still obtain the drum magazines to fulfill the contract.   Eventually, Taos cancelled its contract with GDC based on its failure to provide the promised products. Subsequently, on February 14, 2008, GDC filed a lawsuit against

Paul Restorick and Mil-Tec within the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, claiming breach of contract.

23. According to the Davidov interview, Paul Restorick had told him that Karl [KLEBER] had traveled to Bulgaria and bought various parts and tooling from a company. Paul Restorick allegedly stated that Karl [KLEBER] assembled the product (drum magazines) in Germany (at Transarms), but claimed them to be Bulgarian made. Based on ATF's recommendation, Davidov requested from Paul Restorick a letter from Karl KLEBER verifying that the drum magazines in question were of Bulgarian origin and were assembled in Germany. Davidov claimed that sometime in September 2009, Paul Restorick told him that this letter was produced by Karl KLEBER and eventually sent to ATF in Washington, D.C. As a result, Davidov requested a copy of that letter for his own records. Davidov stated that Paul Restorick refused to produce a copy of the letter, and further directed Carlos Davidov not to pursue the matter any further for fear of jeopardizing the ATF Form 6 application (for the drum magazines). When Carlos Davidov contacted ATF about the letter, he was told that no letter had ever been received. Carlos Davidov claimed that Paul Restorick had repeatedly instructed him

14

not to contact, or have any contact with, Karl KLEBER or ATF concerning the issue.

24.   According to the Davidov interview, the name of the Bulgarian company that sold the parts and tooling to Transarms to manufacture/assemble the drum magazines in Germany was "KINTEX."

### The BKA Investigation of Karl KLEBER and Transarms

25.   In 2009, your affiant and Special Agent Reimann learned that the BKA had initiated an investigation of Karl KLEBER and Transarms in 2008, and had concluded their active investigation with the execution of searches of Transarms and Karl KLEBER's residences in Germany and Portugal, and interviews with Karl KLEBER and his employees.   During the investigation, the BKA had conducted a court-sanctioned wiretap of Karl KLEBER's cellular telephone and the main business line to Transarms.   This effort culminated in the recording and monitoring of over approximately 21,000 telephone calls from June 2008 through March 2009.

26.   BKA investigators had initiated their investigation of Karl KLEBER and Transarms upon learning of his company's possible involvement in the illegal sale of machineguns via Croatia to Iraq.

15

Your affiant and Special Agent Reimann were later informed by BKA investigators that, during their investigation, they had determined that Karl KLEBER was also a principal shareholder in two other companies involved in the international arms trade:   JAGO Ltd., Faldingworth, United Kingdom, and Xmilitaria Ltd., Loughborough, United Kingdom.   According to BKA investigators, Karl KLEBER owns a 38% share in JAGO Ltd., with United Kingdom citizens Gary Hyde (32%) and John Smith (30%) owning the remaining shares.   According to the BKA investigators,   KLEBER and Gary Hyde are also listed as "Directors" of XMilitaria Ltd.

27.   Your affiant was informed that the BKA investigation focused on various violations of German criminal law by Transarms and/or Karl KLEBER.   However, this did not include the importation into Germany, and subsequent exportation out of Germany, of Chinese-manufactured AK-47 rifle drum magazines.   The BKA investigation is still open at this time.

28.   In April 2010, your affiant, along with Special Agent Reimann, met with BKA investigators in Germany in order to review evidence gathered in their investigation of Karl KLEBER and Transarms.   BKA investigators provided your affiant and Special Agent Reimann with access to intercepted and recorded telephone

calls and electronic mail conducted between Karl KLEBER and/or Karl KLEBER's employees and various individuals. These telephone calls and electronic mailings contained discussions that, in whole or in part, referenced Transarms and/or Karl KLEBER's involvement in the importation of the drum magazines into the United States, additional orders of Chinese-manufactured drum magazines by Transarms and/or Karl KLEBER, and potential orders and shipments of drum magazines by Transarms and/or Karl KLEBER.

29.   BKA investigators further provided your affiant and Special Agent Reimann with access to various documents seized from Transarms that referenced Transarms and/or Karl KLEBER's involvement in the importation of the drum magazines into the United States, additional orders of Chinese-manufactured drum magazines by Transarms and/or Karl KLEBER, and potential orders and shipments of drum magazines by Transarms and/or Karl KLEBER.

30.   The review of this evidence by your affiant and Special Agent Reimann revealed that, between March 2008 and March 2009, Transarms and/or Karl KLEBER were involved in, minimally, two purchases of several thousand Chinese-manufactured drum magazines, and the attempted third purchase/shipment of Chinese drum magazines. Based on the review of evidence in this case, your

affiant submits that these shipments were made from China eventually to Germany, and the first shipment of Chinese drum magazines was knowingly exported from Germany to ATI in the United States (as described above).

## Evidence of Chinese-Manufactured Drum Magazines Shipped to ATI in August 2008

31.  Specifically, your affiant and Special Agent Reimann reviewed the following documents and communications (seized by the BKA) regarding the August 2008 importation of Chinese-manufactured AK-47 rifle drum magazines into the United States:

a.  Copy of an invoice from China Xinshidai Company, Beijing, China, to Transarms, dated March 5, 2008, documenting the shipment of 5,000 AK-47 rifle drum magazines from Guangzhou, China, to Manchester, England, and listing the handling agent as JAGO Ltd. [it should be noted that ATI filed its ATF Form 6 application (seeking permission to import the drum magazines from Transarms) with the ATF on March 18, 2008];

b.  Copy of Transarms invoice dated April 29, 2008, addressed to ATI, for approximately 10,000 drum magazines;

c.  Copies of Transarms requests to German government, dated May 5 and June 18, 2008, to export drum magazines to ATI;

d.  Copies of ATI correspondence addressed to Transarms, dated May 30 and June 10, 2008, containing End Use Certifications for the ammunition and drum magazines to be purchased from Transarms;

e.  Recording of conversation on June 30, 2008, between Herr Starck, a Transarms employee, and Guy Tinsley, ATI representative in Europe, in which the drum magazines are discussed as being packed in a container, and there is discussion concerning the ATF Form 6A;

18

f.    Recording of conversation on July 4, 2008, between Karl KLEBER and Guy Tinsley in which Karl KLEBER acknowledges that there were supposed to be 10,000 drum magazines exported to the United States, but that another 5,000 will be received by Transarms at the end of August;

g.    Recording of conversation on July 11, 2008, between Herr Backer, another employee of Transarms, and Guy Tinsley in which Tinsley requests photographs of the drum magazines;

h.    Recorded conversation, dated August 27, 2008, between Karl KLEBER and Paul Restorick in which they discuss magazines sold to AmChar, along with ammunition, and the next shipment of magazines being in October;

i.    Copy of email, dated August 27, 2008, between Paul Restorick and Karl KLEBER discussing payment to Paul Restorick and AmChar taking a container of drum magazines;

j.    Copy of email, dated August 27, 2008, between Paul Restorick and Karl KLEBER discussing drum magazine sale to AmChar, the General Defense Corporation lawsuit, and sending a facsimile of the ATI/AmChar invoice to Gary Hyde and Paul Restorick;

k.    Recorded conversation, dated September 5, 2008, between Karl KLEBER and an unidentified female [surmised by the BKA investigators to be Gary Hyde's wife] concerning expenses incurred by JAGO Ltd. on the drum magazine sale in the United States, and the subsequent profit to be shared for the sale;

l.    A recorded conversation, on October 1, 2008, between Karl KLEBER and Gary Hyde discussing Paul Restorick's involvement in the drum magazines and another drum magazine sale;

m.    A recorded conversation, dated October 7, 2008, between Gary Hyde and Karl KLEBER discussing the need to assess the profits made by the drum magazine sale; and

n.    Copy of email, dated October 17, 2008, from Karl KLEBER to Gary Hyde requesting JAGO Ltd. invoice copies on the 5,760 drum magazine sale in order to calculate Paul Restorick's portion of the profit from the sale.

32.   During the review of evidence, BKA investigators also informed your affiant and Special Agent Reimann that, according to their research of German customs records, Transarms had not imported any products from any entity in Bulgaria since 2008.   The BKA investigators also reported that, according to their investigation, NITI made no drum magazine deliveries to Transarms between 2004 and 2008.

33.   BKA investigators informed your affiant that at no time during the execution of the above-mentioned searches conducted at Transarms and other locations did they find any evidence of stores of drum magazines and/or production facilities for drum magazines.

34.   To date, your affiant has not seen any evidence of Transarms purchasing drum magazines from any country other than China.

### *Additional Chinese Drum Magazine Purchases by Karl KLEBER and Transarms*

35.   Your affiant and Special Agent Reimann reviewed additional evidence provided by the BKA investigators regarding subsequent purchases of Chinese-manufactured drum magazines by Karl KLEBER and Transarms.   This evidence serves to document the

continuing relationship between Transarms/Karl KLEBER and Chinese sources of drum magazines. At times, the evidence refers to previous purchases of Chinese-manufactured drum magazines, possibly those shipped to ATI in the United States in August 2008.

36. The evidence documents the purchase of approximately 6,000 Chinese-manufactured drum magazines in December 2008, as shipped to Transarms in January 2009, and a second attempted purchase of Chinese-manufactured drum magazines in 2009. The status of the second order is unknown to your affiant at this time. The evidence reviewed included the following:

a.    A letter, dated August 27, 2008, sent via facsimile from Karl KLEBER to Yin Wei Guo of China Jing An requesting 6,000 drum magazines as soon as possible and inquiring whether "Xinshidai" is the exporter for them;

b.    An email, dated September 5, 2008, from Karl KLEBER to Ja Yin, describing an upcoming visit to China in September 2008 in which Karl KLEBER seeks to purchase drum magazines from "China Xinshiday";

c.    An email, dated September 24, 2008, from Ja Yin to Karl KLEBER requesting whether Karl KLEBER had obtained the "IIC" for the drum magazines and when it could be sent to begin the export procedure for the drum magazines;

d.    An email, dated October 13, 2008, from Karl KLEBER to Ja Yin stating that the "IIC" for the 6,000 drum magazine order had been sent via courier service;

e.    An email, dated November 25, 2008, from Paul Restorick to Karl KLEBER in which they discuss the new drum magazine order and the status of the GDC lawsuit;

f.   An email, dated November 25, 2008, from Karl KLEBER to Ja Yin (including Gary Hyde as an addressee), seeking information on when the drum magazines will be shipped;

g.   An email, dated December 25, 2008, from Ja Yin to Karl KLEBER (including Gary Hyde as an addressee), stating that the drum magazines are to be shipped on January 1, 2009, and are scheduled to arrive at Hamburg on January 24, 2009;

h.   A Bill of Lading, dated December 12, 2008, sent via facsimile from China Jing An Import and Export Corporation to Karl KLEBER and Transarms, detailing the shipment of AK-47 drum magazines from Guangzhou to Hamburg, Germany, planned for January 2009;

i.   An invoice, dated December 18, 2008, sent via facsimile from China Jing An Import and Export Corporation, Beijing, China, to Transarms requesting payment for the sale of 6,000 drum magazines;

j.   An email dated January 7, 2009, between Karl KLEBER and Ja Yin in which Yin states that a packing list and invoice for the drum magazines has been sent;

k.   An email dated January 16, 2009, between Karl KLEBER and Ja Yin in which Karl KLEBER requests a copy of the invoice for the drum magazines in order to present it to customs;

l.   A recorded conversation on January 21, 2009, between Herr Backer (a Transarms employee) and Gary Hyde in which Herr Backer reports that Karl KLEBER is very angry and that he wanted a sample drum magazine sent to the United Kingdom and not the United States;

m.   A recorded conversation on January 24, 2009, between Karl KLEBER and Guy Tinsley concerning an [ATF] "Form 6" being ready and a discussion that ATF FEO Vasquez had received information that other FFL's had complained about the origin country of the drum magazines being sold by Transarms;

n.   A recorded conversation on January 26, 2009, between Karl KLEBER and Paul Restorick in which Karl KLEBER confirmed that he was sending a letter to Mick Ranger (a managing official of Imperial Defence, an arms company based in the United Kingdom) that NITI was the source of the drum magazines;

o.    A letter, dated January 26, 2009, sent via facsimile from Karl KLEBER and Transarms to Mick Ranger and Guy Tinsley, confirming that the drum magazines offered for sale to them by Transarms were of Bulgarian origin.  Specifically, the letter states: "We confirm that the drum-magazines offered to you have been assembled here in Germany.  We bought the parts several years ago from the now defunct NITI Co.  in Kasanlak/Bulgaria.  The magazines had not been complete [sic] and we had parts made here in Germany and have assembled them in our production-facilities";

p.    A recorded conversation on January 27, 2009, between Karl KLEBER and Guy Tinsley in which they discuss branding new drum magazines and that a payment to Paul Restorick on the profits of the drum magazine sale would assist him [Restorick] in paying Davidov [this is a possible reference to the General Defense Corporation lawsuit against Paul Restorick and Mil-Tec];

q.    An email, dated January 27, 2009, between Karl KLEBER and Paul Restorick in which they discuss other American FFLs having knowledge about the Transarms drum magazine sales;

r.    A recorded conversation on January 28, 2009, between Karl KLEBER and Gary Hyde in which Karl KLEBER said that he spoke with "Joe" at ATI and that there was nothing new and everything was okay;

s.    A recorded conversation on January 28, 2009, between Karl KLEBER and Gary Hyde in which they discuss a purchase order for 6,000 drum magazines;

t.    A recorded conversation on February 2, 2009, between Karl KLEBER and Guy Tinsley, in which they discuss an additional order of 6,000 drum magazines, branding the drum magazines, and the fact that there are three unidentified customers in the United States for these drum magazines;

u.    A recorded conversation on February 2, 2009, between Karl KLEBER and Paul Restorick, in which they discuss a transfer of $75,000 by Guy Tinsley to Paul Restorick with regards to the profit of the drum magazine sale, and the stamping on the lids of the drum magazines;

23

v.   An email, dated February 3, 2009, from Karl KLEBER to Ja Yin in which Karl KLEBER places an order for 18,000 drum magazines;

w.   An email, dated February 4, 2009, from Karl KLEBER to Ja Yin in which Karl KLEBER states: "Concerning the drum-magazines, we would like to import only the semi-finished – stamped metal parts and assemble them here in Germany.   In this way we can sell them as 'made in Germany.'   Can you give us the price for 18.000 part sets";

x.   A recorded conversation on February 5, 2009, involving Karl KLEBER and Guy Tinsley in which they discuss keeping the lids to the drum magazines as is, selling drum magazines to an ATI employee, and a down payment on drum magazines by Mick Ranger;

y.   An email, dated February 23, 2009, from Karl KLEBER to Ja Yin (Gary Hyde included as an addressee) in which Karl KLEBER reiterates the need for unmarked stamped drum magazine parts, unassembled, so that they can be assembled in Germany and marked as such;

z.   An email, dated February 26, 2009, from Karl KLEBER to Paul Restorick, discussing Karl KLEBER providing Paul Restorick an advance payment on the profit from the sale of the drum magazines;

aa.   A recorded conversation on March 3, 2009, between Karl KLEBER and Guy Tinsley in which they discuss the sale of drum magazines and Guy Tinsley remarks that he did not care where items they were selling originated from;

bb.   A recorded conversation on March 12, 2009, between Karl KLEBER and Guy Tinsley in which they discuss an unidentified customer as having their [ATF] "Form 6" refused.

*Conclusion*

WHEREFORE, based upon the foregoing, I respectfully submit that there is probable cause to believe that, between in or about March 2008 and in or about September 2008, in the Western District of New York, and elsewhere, Karl KLEBER violated Title 18, United States Code, Sections 545 and 2 by knowingly aiding and abetting and willfully causing the importation into the United States of Chinese-manufactured AK-47 rifle drum magazines contrary to law, that is, in violation of Title 27, Code of Federal Regulations, Sections 447.42(a)(1)(iv)(A), 447.61(c), 447.62 and 447.63.

_____
M. DIXON ROBIN
Special Agent
Bureau of Alcohol, Tobacco, Firearms,
and Explosives

Subscribed and sworn to before me
this ____2____ day of July, 2010.

_____
HONORABLE JONATHAN W. FELDMAN
United States Magistrate Judge

25